STATE TAX COMMISSION *vs.* JOHN HANCOCK MUTUAL
LIFE INSURANCE COMPANY.

Suffolk.    November 9, 1960. — December 8, 1960.

Present: WILKINS, C.J., SPALDING, WILLIAMS, WHITTEMORE, &
CUTTER, JJ.

*Taxation,* Insurance company. *Insurance Company,* Pension plan. *Statute,* Construction. *Words,* "Net value of all policies."

Where a life insurance company, in order to establish "a retirement pension benefit plan for its [own] employees" pursuant to G. L. c. 175, § 36, "as insurer" issued to itself "as employer" in 1938 a group annuity contract similar to those sold commercially in the ordinary course of its business and assumed as "operating expense" the cost of such contract except a minor portion paid by the employees' contributions, the amount of reserve liability set up by the company against the cost of such contract so assumed by it was rightly excluded by it from the "net value of all policies in force . . . issued or assumed by" it used in the computation of its excise under c. 63, § 20, as amended by St. 1941, c. 509, § 5.    [565]

The canon of construction that a tax statute should be strictly construed and all doubts resolved in favor of the taxpayer was applied where a tax statute contained no express provision including a certain transaction within its scope and raised real doubt whether the transaction was intended to be included.    [565]

APPEAL from a decision by the Appellate Tax Board.

*Leo Sontag,* Assistant Attorney General, for State Tax Commission.

*Albert L. Hyland,* for the taxpayer.

CUTTER, J.    The State Tax Commission appeals from a decision of the Appellate Tax Board granting to the insurance company an abatement of a part of the company's insurance excise assessed in 1957.    This excise is imposed by G. L. c. 63, § 20 (as amended by St. 1941, c. 509, § 5, and as affected by St. 1943, c. 531, § 2), at the rate of "one quarter of one per cent upon the net value of all policies in force on December thirty-first of the year preceding that in which

the tax is payable, issued or assumed by such company on the lives of residents of this commonwealth . . . ."[1]

The company is a Massachusetts life insurance company. In its excise return filed in 1957, it excluded from the net value of its policies in force on December 31, 1956, $25,601,551, representing "the Massachusetts portion of . . . [the company's] reserve liability for its assumption of cost under" an "instrument . . . called a group annuity contract, numbered 6 GAC," which had been issued in 1938 by the company "as insurer" to itself "as employer" in order to establish "a retirement pension benefit plan for its [own] employees." On June 21, 1957, a deficiency was assessed "based entirely upon the inclusion of the . . . $25,601,551 in the net value of" the company's policies in force at the end of 1956. The company paid $65,411.96, the additional excise stated on the deficiency assessment bill to be due, and applied for a correction of the excise. It later appealed to the Appellate Tax Board when the commission failed to abate the additional excise. The case was heard on a statement of agreed facts.

By St. 1943, c. 531, effective (see § 7) on January 1, 1944, the excises upon life insurance companies were revised to provide (see § 1) a new measure based upon premiums. See *Commissioner of Corps. & Taxn.* v. *Metropolitan Life Ins. Co.* 327 Mass. 582, 583. Cf. *Commissioner of Corps. & Taxn.* v. *Aetna Life Ins. Co.* 328 Mass. 404, 406–409. Section 2, however, provided that certain insurance companies, of which the company was one, were to continue[2] to be taxed under § 20 as theretofore existing (see St. 1941, c. 509, § 5) upon the "net value of policies." By G. L. c. 175, § 1, the

---

[1] In the 1941 version of § 20, which applied to the company in 1957, it is provided that in "respect to ordinary business the aggregate net value so reported shall be the combined aggregate of the mean reserve computed for each policy, or each group of policies requiring a separate computation to determine their net value, on the basis of valuation used or approved by the commissioner of insurance under" c. 175, § 9, and that in "respect to industrial business the aggregate net value so reported may be estimated upon the basis of such general averages or otherwise as shall be authorized by the commissioner with the approval of the commissioner of insurance."

[2] For a period more fully defined in § 2. See *State Tax Commn.* v. *Aetna Life Ins. Co.* 332 Mass. 395, 396.

term "[n]et value of policies" is defined as "the liability of a company upon its insurance contracts . . . computed by rules of valuation established by sections nine to twelve, inclusive." Section 9 requires that the insurance "commissioner shall each year compute the . . . net value on December thirty-first . . . of every life company . . . with respect to . . . [described] policies or contracts . . . issued . . . prior to" January 1, 1948, "in accordance with the following rules: . . . 8. The aggregate net value . . . shall be . . . the reserve liability of the company, to provide for which it shall hold funds of an amount equal thereto above all its other liabilities."

By executing 6 GAC on December 28, 1938, the company established under c. 175, § 36,[3] its retirement pension benefit plan effective for all its employees as of May 1, 1938. By St. 1938, c. 218, § 1, effective ninety days after April 14, 1938, the substance of the third and fourth paragraphs had been inserted in § 36 to permit the payment of pensions "under a group contract issued by it."

6 GAC provides that "the . . . company . . . agrees to pay to each of its employees entitled thereto, under the . . . provisions of this [c]ontract, a [r]etirement [a]nnuity for life in an amount based on the rates and schedules contained herein, and to pay such amounts as may become due in case of death or termination of employment of an employee covered hereunder . . . ." and recites that it is issued "to set forth the terms, the benefits, and the conditions of the pension system for its employees established by the

---

[3] Section 36 (as amended through St. 1954, c. 75) reads: [Par. 1] "Any domestic company . . . may grant a pension to any employee who has been in . . . service . . . for ten years and who has reached age sixty-five or has become incapacitated . . . or to any employee retiring by reason of the infirmities of age . . . in . . . service . . . for not less than fifteen years. . . . [Par. 2] Any such company . . . may also establish . . . an employee's savings fund, pension system or association for the benefit of its employees. . . . [Par. 3] Any domestic life company may . . . also provide for . . . pensions to its aged or disabled employees under a group contract issued by it. The employees and the company shall contribute to the cost of, or the premium for, any such contract. Such a company may . . . insure the lives of its employees under a group policy issued by it . . . . [Par. 4] The term 'employee,' as used in this section, shall include an officer." The second and third sentences of the third paragraph were revised by the 1954 statute from their original 1938 form in respects which do not seem to be material here.

[c]ompany under" § 36.   Article V, § 1, of the provisions attached to 6 GAC provides that the company shall issue to itself, "for delivery to each employee covered . . . an individual [c]ertificate containing . . . a statement of the benefits . . . under this [c]ontract and stating the name of the [death benefit] beneficiary."

An employee may become covered under 6 GAC only by making written application and by agreeing to make the required contributions, which (see art. II, § 4) vary in relation to the character of employment and salary of the particular employee.   Each employee's certificate recites that, "subject to the . . . provisions of . . . 6 GAC," he "will be entitled to a [r]etirement [a]nnuity for life" if he remains covered until retirement, and summarizes the provisions of the contract.

" [A] portion of the cost . . . [of the plan] has been . . . and is now paid by the employees.   The balance of the cost is assumed by the . . . [company] and is charged to its operating expense.   This . . . is handled . . . by bookkeeping entries wherein the . . . [company] . . . monthly . . . charges to its . . . expenses its contribution . . . and . . . credits the corresponding total amount to the 'renewal group annuity premiums' account."   6 GAC "is similar . . . to . . . [other contracts] generally issued by the . . . [company] in the normal course of its business to employers, purchasing for their employees retirement group annuity contracts.   [It] . . . is . . . administered . . . in substantially the same manner as [such other] group annuity contracts . . . .   The duties . . . placed upon an outside employer under a normal group annuity contract are handled under 6 GAC by the . . . [company] . . . as employer, in its own personnel department."

"The Massachusetts portion of the . . . [company's] reserve liability on December 31, 1956 . . . which arose out of the assumption of its part of the cost . . . was $25,601,551 . . . .   The Massachusetts portion of the . . . reserve liability . . . [resulting from] the employees' contributions . . . was $4,660,680.   This amount has been in-

cluded in the net value of policies on the . . . excise tax
return. The amount of tax paid on this (at ¼ of 1%)
amounted to $11,651.71."

The excise "is not a property tax although measured by
property," see *Commissioner of Corps. & Taxn.* v. *Aetna
Life Ins. Co.* 328 Mass. 404, 408, but is imposed "for the
privilege of doing business in this Commonwealth." See
*Commissioner of Corps. & Taxn.* v. *Metropolitan Life Ins.
Co.* 327 Mass. 582, 584. See also *Mutual Benefit Life Ins.
Co.* v. *Commonwealth,* 227 Mass. 63, 66; *Commissioner of
Ins.* v. *Commonwealth Mut. Liab. Ins. Co.* 308 Mass. 385,
387. Under c. 63, § 28 (as amended through St. 1953, c. 654,
§ 55), "[l]iability for the taxes imposed by" §§ 20 to 23 or
by St. 1943, c. 531, §§ 2 and 3, "shall be incurred by . . .
the transaction of business . . . within the calendar year
preceding" the year of assessment. The excise measure of
§ 20 has borne a close relation to the volume of business.
This has been true equally whether the measure has been
"two per cent upon all new and renewal premiums re-
ceived," as in the 1943 act, or "one quarter of one per cent
upon the net value of all policies in force," as in the 1941
act.

The Appellate Tax Board concluded that the company's
"annuity contracts issued . . . to carry out its pension
plan" revealed an "absence of profit motive," that the
transactions "did not constitute the carrying on of an in-
surance business with respect to which the excise . . . is
imposed," and that "the tax is limited . . . to those poli-
cies which stem from the doing of such business." The
board pointed out the absence of an "express [statutory]
provision . . . which levies a tax on the net value of an
employees' retirement pension plan as such." This, says
the board, "raises a . . . doubt . . . whether the Legisla-
ture intended to tax the net value based on the annuity con-
tract under the pension plan." The board then, in grant-
ing the abatement, applied the well established principles
(see *Gordon* v. *State Tax Commn.* 335 Mass. 431, 435, 437;
*Allen* v. *State Tax Commn.* 337 Mass. 502, 504; *State Tax*

*Commn.* v. *Gray,* 340 Mass. 535, 540) that tax statutes
are to be strictly construed and that all doubts are to be re-
solved in favor of the taxpayer.

The board's view is supported by the only closely rele-
vant decision which has come to our attention. See *Cali-
fornia-Western States Life Ins. Co.* v. *State Bd. of Equali-
zation,* 151 Cal. App. 2d 559. The employees' retirement
plan there considered resembled the company's plan in
general outline. California imposed an annual excise
(similar in some respects to that found in G. L. c. 63, § 20,
as amended in 1943) based upon the amount of gross pre-
miums, less return premiums, received from each com-
pany's business done in California. The court recognized
(at p. 560) that the "retirement plan . . . contains . . .
many features . . . generally found in group annuity poli-
cies . . . regularly issued by insurers." As the court re-
marked, "The same could be said of any comprehensive
retirement plan." Nevertheless, the court concluded that
the plan was not within the tax measure since "the reten-
tions . . . of a part of wages due participating employees
were not premiums received . . . upon its business done"
as the term was used in the tax statute and "that . . .
[the] retirement plan did not . . . constitute an insurance
policy or an annuity contract within the meaning" of the
statute. The court said (at p. 561), "Regardless of the
noted similarities in so many of the [plan's] provisions . . .
to those found in annuity policies regularly sold by insur-
ers, the great dissimilarity which inheres in the total ab-
sence of profit motive . . . compels a conclusion that the
. . . employees' retirement plan cannot be classified as in-
surance business . . . in this state. Such was not its pur-
pose and such was not its nature. Had this plan been . . .
maintained by an employer who was not an insurer . . . no
one would contend that it was an insurance contract or that
its . . . maintenance constituted the doing of insurance
business. . . . [T]hat respondent is an insurer is not com-
petent to alter either the purpose or the nature of its em-
ployees' retirement plan."

Little light is shed by examination of the history of the statutes relating to life insurance company pensions. Statute 1907, c. 576, § 27, forbade insurance companies to "pay any pension whatsoever." By St. 1913, c. 613, § 1, pensions were permitted, subject to the requirement, among others, that any company paying pensions of $10,000 or more in any year should "establish an employees' savings fund or contributory pension system . . . to which fund or system the employees shall contribute . . . not less than the amount contributed by the company."[4] No language of the 1938 act suggests that the Legislature had taxation in mind at all nor does its legislative history indicate (see 1938 Sen. Doc. No. 324) whether more was intended by the 1938 amendment of § 36 than to allow insurance company pensions under group contracts in a manner which would be administratively feasible and would also protect company solvency.

The history of c. 63, § 20, is equally unrevealing. The basic principles of the insurance excise (a percentage excise upon "the aggregate net value of all policies in force on" the preceding December 31) enacted by St. 1880, c. 227, § 1, have continued except to the extent that the premium tax basis was introduced by St. 1943, c. 531, § 1. The 1880 excise was soon held not to be unconstitutionally unequal. See *Connecticut Mut. Life Ins. Co.* v. *Commonwealth,* 133 Mass. 161. This court said (at pp. 163–164), "making contracts of insurance and . . . paying losses" do not constitute "the only important function exercised by life insurance corporations. . . . [A]nother . . . function has been engrafted upon the system, that of receiving, . . . investing and managing property for the benefit of the policy holders." Then after reviewing the method by which the existence of "net values" of policies comes about, the court

---

[4] These provisions, later embodied in G. L. c. 175, § 36, were further relaxed, in minor respects not now relevant, by St. 1931, c. 290, St. 1935, c. 140, and St. 1936, c. 61. Amendments after 1938 by St. 1951, c. 125, and St. 1954, c. 75, do not affect the present problem. We do not find the later adopted provisions of c. 175, §§ 36A and 36B, inserted by St. 1948, c. 496, and St. 1954, c. 247, of assistance in interpreting what was done in 1938.

proceeded (at pp. 164–165), "The fund thus accumulated is
. . . held by . . . [the insurer] as a quasi trustee, for . . .
the policy holders.   It has the legal title . . . but holds the
property in the exercise of a franchise . . . to receive . . .
it for the benefit of others. . . .   Companies doing business
upon this plan thus resemble savings banks, exercising the
franchise . . . of receiving, investing and managing the
money of numerous policy holders.   It is this franchise . . . .
which is taxed . . . ."   The opinion continues (p. 165), "Re-
garding the statute as intended to tax the . . . privilege of
holding and managing the property of others, the method
adopted to ascertain the value of this privilege is not un-
reasonable.   The net value of a policy represents approxi-
mately the . . . payments . . . by the holder in excess of
the yearly cost of insurance, and thus the aggregate net
values which furnish the basis of this tax represent ap-
proximately the amount of money of [Massachusetts] citi-
zens . . . which the company . . . is investing and man-
aging by virtue of its franchise."

This language, of course, had no relevance to any em-
ployees' retirement fund of a company subject to the excise.
It was written over fifty years before the 1938 amendment
of c. 175, § 36, made such a fund possible.   Even if some of
the language may seem broad enough to include the holding
of such funds as within the privilege taxed, the only reserve
funds really considered by the court must have been those
held by a taxed company for persons who had bought poli-
cies or annuities in the regular course of business.   The
1941 and 1943 amendments (see 1943 House Doc. No. 546)
of c. 63, § 20, the only ones passed after the amendment of
c. 175, § 36, contain no explicit imposition of a tax measured
by such employees' retirement funds, and shed no light on
the question before us.

The question before us under § 20 cannot be determined
merely by saying that the company as insurer cannot con-
tract with itself as employer and that, therefore, 6 GAC
cannot be a policy within the excise measure.   Cf. *Yosemite
Portland Cement Corp.* v. *State Bd. of Equalization,* 59 Cal.

App. 2d 39, 43. We have no doubt that, at least between the company and its participating employees, contracts do exist which incorporate by reference the provisions of 6 GAC. These contracts, apart from the circumstance that the company has paid a great part of their cost, are in many respects similar to what the employees would have received under commercial annuity contracts. 6 GAC, however, is not a product of the company's solicitation of the purchase of insurance policies by the general public. Instead, it is one aspect of the company's employer-employee relations, a method by which it assumes an expense to facilitate its business and compensates its employees for services in its usual insurance operations. This is indicated by the circumstance that the company pays such a large part of the cost and that the employees' contributions vary in relation to the character of employment and salary of the covered employees, respectively. The net values created by the company's contribution do not represent directly premiums paid by the company's customers for their coverage.

Some analogy may be found in the situation considered in *Everett* v. *Commissioner of Corps. & Taxn.* 317 Mass. 612, 615. There it was held that payments to retired employees under a retirement plan were not taxable as income from annuities under G. L. c. 62, § 5 (a), but were retirement allowances taxable as business income under § 5 (b). This court, looking at the substance of the situation, said that the payments had "their source in the employer and employee relationship and are in the nature of further compensation for services" and hence retirement allowances, even though the employee "had made contributions in order . . . to join the plan" and despite the fact (see p. 616) that the "allowances were paid through an insurance company." Although the *Everett* case is not a direct precedent, it is an example of testing the applicability of a tax by the true nature of the property taxed or constituting the measure of the tax.

The commission argues that the use of the words "contract," "premium," and "group policy" in the third para-

graph of G. L. c. 175, § 36 (see footnote 3, *supra*), indicates a legislative intention that these arrangements be treated as "policies." It relies upon the stipulation that the insurance commissioner would testify that, in his "opinion," it is his duty under c. 175, § 9, to "compute the reserve liability . . . of . . . 6 GAC" in computing the year-end "reserve liability or net value . . . of every life company . . . with respect to . . . policies or contracts." In interpreting the insurance excise provisions of c. 63, on occasion we have looked to c. 175 for clarification. See *Commissioner of Corps. & Taxn.* v. *Aetna Life Ins. Co.* 328 Mass. 404, 407–408. Indeed, c. 63, § 20 (see footnote 1, *supra*), expressly refers to c. 175, § 9, as governing the computation of the "aggregate net value" of policies constituting "ordinary business" of the company. The insurance commissioner's views about his duties under § 9, even if admissible, are not controlling, nor does c. 63, § 20, purport to make c. 175, § 9, conclusive of what constitutes a policy for purposes of the excise. Each of these sections should be interpreted in a manner consistent with its separate purpose. Section 9 is designed to make certain that each insurance company (see par. 8 already quoted) "hold[s] funds of an amount equal" to its reserve liability "above all its other liabilities." Company solvency obviously thereby will be promoted. The liability under 6 GAC, even if it arises out of the employer-employee relationship rather than from usual insurance policy sales, is a liability of a type which should be protected in the public interest by adequate reserves. That, for the purposes of § 9, the reserves behind 6 GAC may be included in determining the company's financial position, does not necessarily mean that 6 GAC is a policy for the different purposes of c. 63, § 20. That is a question of what the Legislature meant the measure of the excise to be.

It was agreed that from "the inception of 6 GAC through . . . 1955, the . . . [company] included in its net value of policies (and paid its . . . excise measured thereby) the Massachusetts portion of its reserve liability for its as-

sumption of cost under . . . 6 GAC." The company is not bound in 1956 and 1957 by its practice in earlier years under an ambiguous statute. The stipulation falls short of showing any published tax regulation uniformly adopted with respect to all insurance companies similarly situated and contemporaneous with the 1938 statute amending c. 175, § 36. Cf. *Commissioner of Corps. & Taxn.* v. *Springfield,* 321 Mass. 31, 38.

We have attempted to give due weight to all the considerations mentioned above bearing upon the proper interpretation of the 1941 version of c. 63, § 20, read in connection with the relevant provisions of c. 175. Having done so, we conclude that there is no clear expression of legislative intention to include within the measure of the excise at least so much of the reserves behind an employees' retirement fund like 6 GAC as is based on company contributions.[5] We are impressed by the reasoning of the California court in the *California-Western States Life Ins. Co.* case (151 Cal. App. 2d 559) already quoted differentiating between a company's own employees' retirement fund and a group annuity or policy commercially issued in the ordinary course of the insurance business. We think serious doubt exists whether the Legislature had any intention to classify the retirement fund for taxation with policies issued in normal course. Because real doubt as to the legislative intention exists, under the familiar principles mentioned by the Appellate Tax Board such doubts are to be resolved in favor of the taxpayer. Were we to decide otherwise, we would improperly lay undue emphasis on a possible "literal meaning" of the word "policies" in the 1941 version of § 20 and include within the scope of § 20 reserves which "do not fairly come within its spirit and intent." See *Kenney*

---

[5] The company has raised no question with respect to that part of the net value of 6 GAC created by employee contributions and we do not deal with it. Although the tax statute provides (see *Allen* v. *State Tax Commn.* 337 Mass. 502, 507) no method of segregation of values arising under a contract like 6 GAC, the portion of the company's liability based upon its own contributions seems to us to be outside the scope of § 20, whatever may be the situation with respect to the remaining liability of the company under 6 GAC.

v. *Building Commr. of Melrose,* 315 Mass. 291, 295; *Hodgerney* v. *Baker,* 324 Mass. 703, 706. If the result reached is "unintended," we assume that "the Legislature will be able to enact a clarifying amendment." See *State Tax Commn.* v. *Aetna Life Ins. Co.* 332 Mass. 395, 402.

Abatement is to be granted in accordance with the decision of the Appellate Tax Board in the amount of $65,411.96 with costs.

*So ordered.*