THE NATIONAL SHAWMUT BANK OF BOSTON & another, executors, *vs.* COMMISSIONER OF CORPORATIONS AND TAXATION.

Suffolk. April 5, 1968. — May 10, 1968.

Present: WILKINS, C.J., WHITTEMORE, CUTTER, SPIEGEL, & REARDON, JJ.

*Taxation,* Succession tax. *Pension. Retirement.*

In the circumstances, under a certain company pension plan for salaried employees, considered as a whole, payments made to the widow of an employee during her life pursuant to his having elected an option "to accept an actuarial reduction in the payments" to him under the plan during his life after his retirement in order to provide such payments to her, were not to be treated as life insurance, and did not arise from an exercise of any power of appointment, but arose from a transfer of a property interest of his to take effect in possession or enjoyment after his death, and were taxable under G. L. c. 65, § 1.

*Cochrane* v. *Commissioner of Corps. & Taxn.* 350 Mass. 237 distinguished. [359–361]

Where an employee agreed to render to his employer consulting services for five years commencing upon the employee's anticipated date of retirement and the employer agreed to pay him a certain sum each year for the five year period, or, if he should die before the end of that period, to pay to his widow, if living, one half of the sum the employee would have received during the remainder thereof, payments received by the employee's widow following his death before reaching the anticipated date of retirement were subject to the tax imposed by G. L. c. 65, § 1. [361–362]

PETITION in equity filed in the Probate Court for the county of Suffolk on May 8, 1967.

The case was reported by *Wilson,* J.

*Roger M. Thomas* for the petitioners.

*Paul N. Gollub,* Assistant Attorney General, for the respondent.

CUTTER, J. The executors of the will of Eugene H. Bird seek abatement (G. L. c. 65, § 27, as amended through St. 1953, c. 654, § 90, see later amendment, St. 1967, c. 550, § 1) of an inheritance tax, so far as measured by (a) payments to Bird's widow under the pension plan of Eastern Gas and Fuel Associates (Eastern), and (b) the value of payments to her under an agreement made with Eastern by Bird prior to his retirement, for consulting services to be rendered after his retirement. The probate judge, upon a statement of agreed facts, reported the case without decision.

## THE RETIREMENT BENEFITS UNDER EASTERN'S PENSION PLAN.

At his death on July 19, 1960, at the age of sixty-seven, Bird was an active, full time employee of Eastern. He was (and had been since 1951) a member of Eastern's "Retirement Plan for Salaried Employees" (the pension plan). This plan provided not only for contributions to it by the employer on behalf of covered employees but also for limited employee contributions up to January 1, 1953. Bird had $3,879 to his credit in the plan for his own contributions. Eastern, as employer, had contributed $170,097.

In 1953, Bird named his wife as beneficiary after his death and requested optional retirement benefits under § X of the pension plan. By this choice, revocable by Bird (see plan, § X [5]) until his death, he "agreed to accept an actuarial reduction in the payments . . . to him under . . . [the p]ension [p]lan during his lifetime after his retirement . . . with 100% of such reduced amount to continue after his death to his . . . widow until her death."

Bird attained age sixty-five on June 23, 1958. His normal retirement date (§ IV [1] of plan) would have been July 1, 1958. He remained active and planned to retire on July 1, 1961. He died before receiving during his life any payments under the pension plan.[1] Under § X (3) of the plan (because he was over age sixty-five at his death), his wife became entitled at once to receive benefits as if Bird had retired on the first day of the month in which his death occurred. She thus will receive from July 1, 1960, monthly payments (§ X [3]) of $1,044.74 until her death,[2] instead of the larger amount which would have been payable for sixty months to some beneficiary if Bird had not selected payment under § X. The effect of an employee's selection of the option under § X is further shown by the computation [3] which would have been made if Bird had retired at the normal retirement age of sixty-five. In any event, payments would

---

[1] Bird during his life was eligible to make various elections under the plan for early retirement benefits provided for employees at ages fifty-five and sixty (§ V of the plan) or for the normal retirement benefit at age sixty-five (§ VIII of the plan).

[2] If Bird had died, as he did, over age sixty-five and prior to his retirement, but had not appointed his widow as beneficiary, $1,974.93 each month would have been payable, under § IX (1) of the pension plan, for sixty months to beneficiaries selected pursuant to the plan.

[3] If Bird had retired at the normal retirement age (sixty-five) without designating his widow as beneficiary under § X, he would have received (under § VIII [1] of the plan) a monthly payment for his life of $1,730.28, but if he had not received sixty such monthly payments, then monthly payments, in any event, would have been made at the same rate, for the balance of the sixty month period, to a beneficiary previously designated by Bird under § IX (3) or otherwise selected pursuant to the plan. If, on the other hand, Bird had retired at the normal age, after designating his wife as beneficiary under § X, the monthly payments to him of $1,730.28 would have been actuarially reduced under § X (1) to $913.59 a month. These would have been paid to Bird during his life and to his widow, during her life, if she survived him.

have been at least equal to all contributions by Bird to the pension plan with credited interest.[4]

## THE AGREEMENT FOR CONSULTING SERVICES.

On May 6, 1960, Bird also entered into an agreement with Eastern for consulting services (the consulting agreement). By this agreement, Bird undertook to render consulting services to Eastern for five years after his anticipated date of retirement on July 1, 1961. For these services Eastern agreed (a) to pay Bird $20,000 each year for the five year period, and (b) if Bird should die after the execution of the agreement and before the end of the five year period, to pay to his widow an amount equal to one half of the amount Bird would have received during the remainder of the five year period (had he lived and performed his obligations under the contract) in equal monthly instalments over a period of five years from the first day of the month following his death. The payments were to terminate, in any event, at the widow's death.[5]

Bird died two and a half months after executing the consulting agreement before receiving any payment under it. His widow then became entitled to payments at the rate of $10,000 per year in equal monthly instalments for five years from August 1, 1960, or until her death, if she should die during the period.

## ASSESSMENT AND COLLECTION OF THE TAX.

The Commissioner of Corporations and Taxation determined that the widow's successions to payments under the pension plan and under the consulting agreement were subject to the inheritance tax imposed by G. L. c. 65. The com-

---

[4] The pension plan (§ XV) provides that Eastern will make an agreement with a corporate trustee or an insurance company to receive and invest the contributions of Eastern and its employees.

[5] The consulting agreement could not have been cancelled or modified during Bird's life without the consent of Bird and Eastern. The payments provided for Bird or his widow under the agreement were not to be subject to assignment or transfer in any manner.

missioner valued the payments to be made to the widow (a) under the pension plan at $177,672.66, and (b) under the consulting agreement at $43,900. In total, the sum of $20,764.92 has been paid by the executors by reason of the commissioner's certifications of inheritance taxes due on various "present" interests, including those on the widow's interests in the pension plan and under the consulting agreement.

1. The executors contend that the retirement benefits paid to Bird's widow under Eastern's pension plan have so many of the characteristics of life insurance, not taxable under G. L. c. 65, as to preclude any inheritance tax measured by them. The executors rest their arguments largely upon *Tyler* v. *Treasurer & Recr. Gen.* 226 Mass. 306, and *Cochrane* v. *Commissioner of Corps. & Taxn.* 350 Mass. 237, 238–240. See Barrett and Bailey, Taxation, §§ 1037, 1040; Casner, Estate Planning (3d ed. and 1966 supp.), p. 339, fn. 105; 13 Ann. Surv. Mass. Law, § 22.18; note, 47 B. U. L. Rev. 611, 612, 618. Any inheritance excise payable with respect to the pension plan benefits to Bird's widow must depend upon the general language of G. L. c. 65, § 1 (as amended through St. 1955, c. 596; see later amendments through St. 1967, c. 463).[6]

Over half a century ago, in *Tyler* v. *Treasurer & Recr. Gen.* 226 Mass. 306, 310, this court held "that sums received by beneficiaries in accordance with designations made in contracts of [life] insurance are not subject to the succession tax." The *Tyler* case was reaffirmed, and applied to life insurance trusts, in *Welch* v. *Commissioner of Corps. & Taxn.* 309 Mass. 293, 296, and in *DeVincent* v. *Commissioner of Corps. & Taxn.* 348 Mass. 758, 760–761, despite the broaden-

---

[6] The pertinent language of § 1 reads, "All property within the jurisdiction of the commonwealth . . . and any *interest* therein, *belonging to inhabitants of the commonwealth* . . . which shall pass . . . by deed, grant or gift, except in cases of a bona fide purchase for full consideration in money or money's worth, made in contemplation of the death of the . . . donor or *made or intended to take effect in possession or enjoyment after his death,* and any beneficial interest therein which shall . . . accrue by survivorship in any form of joint ownership . . . except (1) to or for the use of . . . [certain exempt entities and institutions] shall be subject to a tax [tax rate table not here relevant]" (emphasis supplied).

National Shawmut Bank *v.* Commissioner of Corporations & Taxation.

ing of Federal and State tax concepts [7] concerning transfers related to death which took place in the period after the *Tyler* decision in 1917.

In *Gregg* v. *Commissioner of Corps. & Taxn.* 315 Mass. 704, 709–711, we limited the scope of the *Tyler* case to arrangements having the risk characteristics of life insurance, and declined to apply those principles to a retirement annuity contract of the "refund" type. Under that contract, if the annuitant died before he had received the amount of the premiums paid in by him to the insurance company, then a death benefit would be paid at the annuitant's death to a designated beneficiary in substantially the amount by which (a) the amount paid in premiums exceeded (b) the amount paid to the annuitant during his life in annuity benefits. Until his death, the annuitant reserved substantial rights to change the arrangement (pp. 706–707). The opinion, in effect, treated this revocable refund annuity arrangement as more akin to a revocable trust than to a life insurance policy. This court pointed out (p. 708) various distinctions between such a refund annuity arrangement and a life insurance contract.[8]

In 1966, in the *Cochrane* case, 350 Mass. 237, 238–240, we had before us a situation somewhat similar to that presented by Bird's election to take reduced retirement payments under § X of Eastern's pension plan. An admiral, who retired

---

[7] In 1965, in the *DeVincent* case, we recognized that, if the *Tyler* case had been decided in 1965 instead of 1917, a different result might have been reached. We concluded, nevertheless, that, in view of the long lapse of time since the *Tyler* decision, "if any change . . . [was] to be made in the application of G. L. c. 65 to the proceeds of life insurance policies, that change should be made by the Legislature rather than by a new interpretation of the statute by a court."

[8] At page 708, Mr. Justice Ronan said, "The annuity contract . . . was based not upon the contingency of death but upon the expectation of living. The appellant's husband did not submit to a physical examination by any physician before the contract of annuity was executed. The only possible risk that the society took was that the annuitant might live too long. It took no risk whatever with reference to the death benefit for in no event was it required to pay more than it had received. It was not bound to pay a certain lump sum irrespective of the amount paid in as a life company is required to pay upon the death of the insured. An annuity is not an indemnity against loss by death like a life policy. A man purchases an annuity for his own benefit *but one usually obtains life insurance for the protection of his dependents*" (emphasis supplied).

in 1947, was entitled by statute to receive until his death monthly retirement pay of $744.70. Pursuant to the statute, he was also entitled (see pp. 238–239) to elect, and did elect in 1954, to provide a pension for his wife, if she should survive him, equal to one half of the retirement pay thereafter receivable by him, until her death or remarriage. This was to be paid for, in effect, by a reduction of the monthly amount thereafter payable to him. The amount of the reduction in the admiral's normal "retirement pay necessary to justify the government commitment to make this payment to" his widow, was determined (pursuant to the statute) in accordance with an actuarial computation. We concluded that it was "as if the admiral had agreed to pay a monthly premium of $129.35 under a life insurance policy for a specified death benefit payable to his widow in equal monthly instalments during her life or until her remarriage" in a manner "comparable to the annuity options often available under life . . . policies" (see *Commissioner of Int. Rev.* v. *Pierce,* 146 F. 2d 388, 389 [2d Cir.]). The government, we said, (pp. 239–240), "upon the exercise of the option, took the new risk that . . . [the a]dmiral might live for a shorter period (thus permitting fewer deductions from his retirement pay) and that his wife might live longer than the actuaries expected, with the consequence that the government would lose by the bargain. Admiral Cochrane took the risks (a) that his wife would not survive him, or (b) that she would live less long after his death than the actuaries thought probable. There existed, when the option was exercised, the type of actual insurance risk regarded as essential to an insurance contract." On balance, we concluded (p. 240) that "the exercise of the option constituted a transaction having the characteristics of life insurance exempt from inheritance tax." Cf. *Old Colony Trust Co.* v. *Commissioner of Int. Rev.* 102 F. 2d 380, 382 (1st Cir.).

Our decisions thus have interpreted G. L. c. 65, § 1, as having no application to benefits passing to named beneficiaries under life insurance policies or, as in the *Cochrane* case, under a simple arrangement involving certain life in-

surance type risks (a) to the person effecting the arrangement under which benefits are received, and (b) to the person paying such benefits. On the other hand (see the *Gregg* case, 315 Mass. 704), an excise may be imposed under c. 65, § 1, measured by benefits under a refund type annuity, where a deceased annuitant has created a fund and the beneficiary after his death receives only so much of the fund as has not been repaid in periodic benefits to the original annuitant.

General Laws c. 65, § 1, describes the excise thereby imposed only in general terms. Its scope is not stated in detail in the statute but has been defined, with respect to life insurance and similar arrangements, principally by court decisions on a case by case basis. Compare Int. Rev. Code of 1954, § 2039 (annuities), § 2042 (proceeds of life insurance), where detailed statutory language now governs the application of the Federal estate tax in this area.[9] Certainly § 1 does not deal in specific terms with new forms of pension, retirement, and insurance protection, now frequently provided under employees' retirement plans. Indeed, the *Tyler* decision antedated these new developments. In the absence of explicit language in c. 65, § 1, we have as guides only our earlier decisions. We first consider the differences between this case and the *Cochrane* case, the decision which most nearly approaches the present situation.

(1) Admiral Cochrane had been retired from the Navy for several years when he provided a pension for his wife, if she survived him, by reducing his own life pension. Bird had not retired when he chose to have his wife receive benefits under § X. We, however, did not rest the *Cochrane* de-

---

[9] The statement of agreed facts does not indicate whether at Bird's death Eastern's pension plan met the requirements of Int. Rev. Code, § 401 (a). Benefits from qualified plans which do meet those requirements, under Int. Rev. Code, § 2039 (c), are not included in the employee's gross estate for Federal estate tax purposes except to the extent that they reflect the employee's own contributions, as more fully stated in § 2039 (c). Similar arrangements have presented problems of analysis in the application of State inheritance taxes. See Meisenholder, Taxation of Annuity Contracts under Estate and Inheritance Taxes, 39 Mich. L. Rev. 856, 859, 864, 870, 888. See also *Cruthers* v. *Neeld*, 14 N. J. 497, 504–505; *Prudential Ins. Co.* v. *Howell*, 29 N. J. 116, 121–122; *Estate of Chadwick*, 167 Ohio St. 373, 378.

cision on the irrevocability of the admiral's election or on the ground that he was already receiving retirement benefits.[10]

(2) Admiral Cochrane's pension was authorized by statute. Bird's widow's interest arises under a private retirement plan, in which either an insurance company or a corporate trustee (fn. 4) was to serve as investment agent. Eastern's pension plan (despite the provision of § XIII that it "shall not be deemed . . . a contract"), with respect to one who like Bird has already reached normal retirement age, may have somewhat more of the aspect of the usual contractual life insurance situation than the statutory Navy arrangement. See note, 47 B. U. L. Rev. 611, 620.

(3) Admiral Cochrane, in making his statutory election, assumed a risk that his wife would predecease him and that he and his wife, together, would receive less in pension payments than if he had continued to receive his full pension during his life. Bird, until his retirement, or earlier death, could take no substantial risk that his wife would predecease him, for, if she had died while he still remained an active employee of Eastern, his election under § X of the pension plan would have become void (§ X [4]) and other pension plan provisions (see fns. 2, 3) would then have become applicable. If, however, Bird and his wife had both survived his retirement, his prior election would have become irrevocable (§ X [5]) and Bird thereafter would have run the risk that his wife might predecease him.[11] Until and unless Bird's selection under § X was revoked, Eastern's pension plan remained subject to the risk (a) that Bird would die before retirement or live a shorter time after retirement

---

[10] Indeed, under many life insurance policies and similar arrangements, the insured possesses until his death power to effect substantial changes adverse to the interests of the beneficiary (e.g. to change the beneficiary, or to surrender the policy for its cash surrender value). See the *Tyler* case, 226 Mass. 306, 309; the *Welch* case, 309 Mass. 293, 294, 297–299; and the *DeVincent* case, 348 Mass. 758.

[11] An aspect of similarity of the situation under § X of Eastern's pension plan to certain life insurance arrangements may be found in the provision of § X (2) that if the election of benefits under § X is not made "at least five years prior to actual retirement or within one year of the effective date of the [p]lan" evidence may be required of the employee's good health.

than was anticipated, and (b) that the widow would live a longer time after Bird's retirement than was expected.

The *Cochrane* case involved a relatively simple arrangement. A pensioner sacrificed part of a pension, already being received, to provide immediate assurance of life benefits for his wife after his death, if she survived him. It was (see the *Gregg* case, 315 Mass. 704, 708) a transaction not arranged by the admiral, like an ordinary "annuity for his own benefit," but (in adding Mrs. Cochrane as a beneficiary) was set up "for the protection of [the closest of] his dependents" (see fn. 8, *supra*).

The benefits paid to Bird's widow arise under a considerably more complicated type of retirement arrangement which, viewed in the aggregate, does not readily fit within the usual concept of life insurance at the time of the *Tyler* case. The new type of employee retirement arrangement may serve much the same purpose as one function of life insurance in providing a fund (if the cash surrender value is used for this purpose) to support the employee and his wife after his retirement and (if he so elects) to provide support for her after his death if she survives him. Nevertheless, it is different in form from life insurance, and differs in complexity from the relatively simple transaction considered in the *Cochrane* case. We think that the interpretation of what is now c. 65, § 1, adopted in the *Tyler* case with respect to life insurance, should not be extended to the newer forms of employees' retirement plans without express legislative provision.[12]

The executors also contend (a) that the pension plan benefits to Bird's widow do not represent "property" or an "interest" in property passing from Bird to his widow by

---

[12] The executors suggest that a logical extension of the principles of the *Cochrane* case may be warranted because the Legislature has not changed c. 65, § 1, in the light of the decisions already cited, even though urged by the commissioner to do so after the *Cochrane* case. See e.g. 1967 House Doc. No. 137, pp. 5–6; 1967 House Bill No. 143. The long continued legislative acceptance of the interpretation of § 1 in the *Tyler* case is significant, but we do not attach the same weight to failure to change § 1 during the brief period since the *Cochrane* case. See *Harvey Payne, Inc.* v. *State Co.* 345 Mass. 488, 492. Cf. *Gordon* v. *State Tax Commn.* 335 Mass. 431, 436–437. Cf. also *State Tax Commn.* v. *Gray,* 340 Mass. 535, 541.

reason of his death, and (b) that Bird's designation of his wife as the recipient was in the nature of the exercise of a power of appointment not taxable under § 1.

Bird's participation in the pension plan rested on long service with Eastern. Bird, who was over the normal retirement age of sixty-five at his death, had an interest in the plan which he could realize at once by voluntary retirement. He could change its form by arrangement with the plan. Despite the provision (§ XIII) that an employee's rights are not contractual, he was not likely to be subjected (if, indeed, he could be, a matter we need not decide, see § XVIII) to any discriminatory forfeiture of his interest. We think that the benefits passing to his widow (if not life insurance within the *Tyler* case and subsequent decisions) were not a mere possibility but sufficiently arose from a property interest of his to be, under c. 65, § 1 (fn. 6), a transfer taking effect in possession or enjoyment after Bird's death.[13] We also think that Bird, in selecting the provisions of § X for the benefit of his wife, was not merely exercising a power of appointment over property placed in trust by Eastern.[14] Because of the aspect of deferred compensation in the arrangements, he was dealing with a substantial interest created by him. We reach this conclusion even though the legislative intention to tax this type of protective arrangement is not made as explicit in c. 65, § 1, as might be appropriate. Of course, such an intention cannot rest upon, or be extended by, implication. See *Hill* v. *Treasurer & Recr. Gen.* 229 Mass. 474, 475–476; the *DeVincent* case, 348 Mass. 758, 760.

---

[13] For cases discussing whether an employee has a property interest in such a plan prior to his death, see *Dolak* v. *Tax Commr.* 145 Conn. 497, 503–507; *Gould* v. *Johnson,* 156 Maine, 446, 448–454; *In re Brackett Estate,* 342 Mich. 195, 203–206; *Estate of Endemann,* 307 N. Y. 100, 106–108; *Re Patterson,* 21 Ohio Op. 2d 55, 56–61; *Estate of Stone,* 10 Wis. 2d 467, 471–474. See also *Dorsey Estate,* 366 Pa. 557, 562–563; *Cameron Estate,* 15 D. & C. 2d (Pa.) 557, 560–563. Cf. *Estate of Dolbeer,* 117 Ohio App. 517, 522–524; *Enbody & Burke Estates,* 85 D. & C. (Pa.) 49, 52–56; *DeVenuto Estate,* 35 D. & C. 2d (Pa.) 352, 355–361.

[14] For a decision that electing an option under a retirement plan is not merely the exercise of a power of appointment, see the *Dolak* case, 145 Conn. 497, 506–509. See also *Gould* v. *Johnson,* 156 Maine, 446, 452–453; *Dorsey Estate,* 366 Pa. 557, 562.

Our conclusion is based upon a distinction in degree and form in determining what is sufficiently like life insurance to come within the principles of the *Tyler* and *Cochrane* cases. In all forms of life insurance, annuity arrangements, and retirement plans, there is inherently some actuarial measurement of risks (spread in one manner or another over a number of persons) related to the life expectancy and death of the principal insured, the annuitant, or the employee. Cf. *Curtis* v. *New York Life Ins. Co.* 217 Mass. 47, 48–50. Each form of protective provision usually serves one or more of the same purposes served by each of the others. The existence of options under the several forms of protection may make them difficult to classify in all their aspects, as being life insurance, annuities, or retirement plans. Any criterion for determining whether a particular risk is a life insurance risk is not likely to be wholly satisfactory. We hold merely that the benefits under § X of this pension plan, in the context of the whole plan, are too remote from the concept of life insurance in the *Tyler* case to be treated as life insurance under c. 65, § 1, as it now stands. Renewed legislative consideration of the subject, of course, may lead to different and more explicit classifications of the various forms of protective arrangement for inheritance tax purposes. See *State Tax Commn.* v. *Aetna Life Ins. Co.* 332 Mass. 395, 402; *State Tax Commn.* v. *John Hancock Mut. Life Ins. Co.* 341 Mass. 555, 566.

2. What has been said concerning the widow's pension plan benefits applies with even greater force to her benefits under the consulting agreement. That agreement we regard simply as an executory contract made by Eastern to obtain Bird's post-retirement services. It purports to be intended as something more than a mere gratuity for Bird's past services. He owned at his death a contractual commitment of Eastern to pay him compensation. The amount and form of that compensation presumably were fixed in the light of the possibility (which occurred) that he would not live until retirement or for five years after retirement to perform services. In form, this agreement, although Eastern

took some risk in return for his executory promises, was not within the usual concept of an insurance policy or arrangement. Bird had at his death a sufficient property interest in the contract to make the payments to his wife at and after his death more than a mere appointment of property of Eastern, and taxable under G. L. c. 65, § 1, as growing out of a transfer by him.

3. A decree is to be entered in the Probate Court dismissing the petition. The commissioner is to have costs of appeal.

*So ordered.*